UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Lawrence Swint,                                         Case No. 3:17-cv-631

           Plaintiff,

v.                                                      MEMORANDUM OPINION
                                                     AND ORDER


E.I. DuPont de Nemours and Co.,

           Defendant.


## I.    INTRODUCTION

Plaintiff Lawrence Swint alleges Defendant E.I. DuPont de Nemours and Company discriminated against him on the basis of a disability – his addiction to drugs and alcohol. DuPont denies its actions were motivated by a discriminatory animus and seeks summary judgment on Swint's claim. (Doc. No. 30). Swint filed a brief in opposition, (Doc. No. 38), and DuPont filed a brief in reply. (Doc. No. 42). For the reasons stated below, I grant DuPont's motion.

## II.    BACKGROUND

Swint began working at DuPont's Toledo, Ohio facility in 1979, as a summer employee. He became a full-time employee at the Toledo facility, which was a satellite facility to another DuPont plant in Mount Clemens, Michigan, in 1983. He worked a variety of jobs, including as a resin operator. Resin is a hazardous and flammable liquid chemical used as an ingredient in automotive paint.

Around the same time as he began working for DuPont, Swint also became addicted to drugs and alcohol. Over the next 30 years, Swint periodically utilized DuPont's Employee Assistance Program ("EAP") to obtain counseling and treatment for his addiction. Swint entered his first treatment program in January 1986. Swint's supervisor at that time was Scott Landis, who subsequently transferred to the Mount Clemens facility. Landis informed Swint that one of the conditions of Swint's employment would be that Swint must submit to drug tests if DuPont had reason to believe Swint was under the influence of drugs or alcohol while at work.

Swint entered another substance abuse treatment program in June 1996, and again in November 1998. These efforts were unsuccessful, however, and Swint continued using drugs and alcohol.

In August 2003, Swint accidentally spilled solvent at work. While he avoided serious physical injuries, he began to suffer from anxiety as a result of the incident and again sought treatment through DuPont's EAP. Swint was on leave from work between January to May 2004 while seeking treatment.

In August 2005, Swint again sought treatment through the EAP. He returned to work but continued to struggle with his addiction and anxiety until March 2006, when another employee told Steve Black, Swint's supervisor at the time, that Swint had commented that he wished he was dead. Black required Swint to take a drug test, which was positive for THC. Swint then was given the option of choosing between participating in an inpatient treatment program or facing disciplinary consequences, up to and including termination. (Doc. No. 34 at 21).

Swint again chose treatment but this time was successful. He was released from the treatment program on April 11, 2006, to return to work and has maintained his sobriety since then. (*Id.* at 23). Swint was placed on probation for having illicit drugs in his system while at work, an act of serious misconduct under DuPont's employee Code of Conduct. (Doc. No. 31-3 at 16). Swint

2

also signed a return-to-work agreement imposing certain requirements on his continued rehabilitation efforts. (*Id.* at 17).

On October 13, 2010, Swint received a written reprimand from Landis, who had returned to the Toledo facility as the plant manager, after Swint had failed to close a solvent overhead chain valve. (Doc. No. 35-10). The reprimand indicates proper opening and closing of process valves is a fundamental part of maintaining safe working conditions and notified Swint "that continued unsatisfactory performance [would] result in further corrective action being taken[,] up to and including termination." (*Id.*).

In January 2012, Ed Courtemanche, a registered nurse employed by DuPont, was notified that Swint had completed an assessment with an EAP counselor, who recommended Swint follow up with his primary care physician for "medication management" and attend three to four additional EAP sessions. (Doc. No. 31-3 at 18). On April 9, 2012, Courtemanche was notified Swint had successfully completed these recommendations. (*Id.* at 20).

On May 10, 2012, a tank wagon carrying resin from the Toledo facility arrived at the Mount Clemens facility. Upon its arrival, employees at the Mount Clemens facility noticed resin had leaked from one of the tank's manhole covers into the spill box around the cover and onto the ground. (Doc. No. 39-11 at 2). The cover was missing a rubber gasket, (Doc. No. 39-14 at 1), which typically is provided by the third-party company which owns the tank wagon. (Doc. No. 34 at 28). Swint had filled that tank wagon prior to its departure and acknowledged checking a box on a tank wagon inspection sheet indicating the gasket was in place. (*Id.* at 26-28).

Swint stated he often completed the inspection sheets prior to conducting the actual inspection because he knew the steps to be conducted. (Doc. No. 34 at 28). While he noticed the third-party company had failed to provide a gasket for the cover, he thought he could prevent any leaks by further tightening the lid. (*Id.*).

3

Landis met with Swint on the morning of May 11 to discuss Swint's inspection of the tank wagon. Landis informed Swint his job was in jeopardy as a result of noting on the inspection sheet that the gasket was ok but releasing the tank wagon for transit while knowing there was not actually a gasket in place. (Doc. No. 36-4 at 1). Swint was placed on paid leave following his meeting with Landis. (Doc. No. 31-1 at 23-24).

Later on May 11, after Swint met with Landis, Courtemanche sent Landis an email with the subject line "*Confidential: Info on Larry," containing a scanned attachment. (Doc. No. 31-3 at 21). Though the body of the email does not describe the contents of the attachment, Swint surmises Courtemanche forwarded Landis the April 9 letter summarizing Swint's completion of the EAP recommendations because the Bates numbers of the April 9 letter follow the Bates numbers of Courtemanche's email.[1] (*See* Doc. No. 31-3 at 19-21).

Landis provided the information and notes he had compiled following his meeting with Swint to management at the Mount Clemens facility. (Doc. No. 39-15). This information also was provided to DuPont's Global Ethics Committee, which concluded Swint had violated DuPont's Code of Conduct by misstating an official company record. (Doc. No. 39-17 at 2). Landis recalls that David Mosley, DuPont's human resources manager, and Joseph Campbell, the plant manager of the Mount Clemens facility and Landis' boss, instructed him to inform Swint his employment was being terminated. (Doc. No. 31-1 at 22).

Courtemanche was sent to Toledo on May 22 to participate in Swint's "exit interview from a medical support position." (Doc. No. 39-19 at 1). During the meeting with Landis and

---

[1] DuPont takes issue with this assumption because the April 9 document does not reference Landis and Landis did not recall receiving this email and the attachment. (Doc. No. 42 at 13). As DuPont repeatedly points out, however, Landis was deposed six years after Swint was terminated and it is understandable he would not recall every detail independently. Further, the email and the April 9th fax are DuPont's records. If needed, it no doubt could identify the source of the documents it produced.

Courtemanche, Swint elected to resign in lieu of termination. (Doc. No. 41 at 31). The Global Ethics Committee concurred in the decision to provide Swint with the option to resign in lieu of termination. (Doc. No. 39-18 at 3).

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. ANALYSIS

Swint claims DuPont discriminated against him on the basis of his addiction to drugs and alcohol, in violation of Ohio Revised Code § 4112.02. That statute prohibits an employer from terminating or otherwise discriminating against any person on any matter directly or indirectly related to the person's employment "because of" the person's disability. Ohio Rev. Code § 4112.02(A).

Swint may establish a prima facie case of discrimination by showing (1) he is disabled, (2) he was discharged at least in part because of his disability, and (3) he could "safely and substantially perform the essential functions of [his] job" even though he has a disability. *Markham v. Earle M. Jorgensen Co.*, 741 N.E.2d 618, 627 (Ohio Ct. App. 2000) (citing *Hazlett v. Martin Chevrolet, Inc.*, 496 N.E.2d 478 (1986)). An employer acts "because of" an employee's disability when that disability

5

was the reason the employer decided to take the challenged action. *Lewis v. Humboldt*, 681 F.3d 312, 318 (6th Cir. 2012) (citing *Gross v. FBL Fin. Servs.*, 557 U.S.167, 174-75 (2009)).[2]

If the plaintiff establishes a prima facie case, the defendant must offer a legitimate, nondiscriminatory reason for terminating the plaintiff's employment. *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1183 (6th Cir. 1997). The plaintiff then must demonstrate the defendant's justification was pretextual. *Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 516 (6th Cir. 2014). The plaintiff may establish pretext by showing the defendant's proffered reason (1) had no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action. *Id.* (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F3d 876, 883 (6th Cir. 1996)).

### A. SWINT'S PRIMA FACIE CASE

Swint successfully establishes the first prong of his prima facie case. *See, e.g., Hood v. Diamond Prods., Inc.*, 658 N.E.2d 738, 742 (Ohio 1996) (citing *Hazlett*, 496 N.E.2d at 479, for the conclusion that addictions to drugs and alcohol are disabilities under Ohio law). DuPont's argument that Swint's addiction no longer was a disability because he was maintaining his sobriety at the time of the tank wagon incident, (Doc. No. 30 at 14-16; Doc. No. 42 at 7), betrays a fundamental misunderstanding of the nature of addiction. Moreover, DuPont itself extensively recounts Swint's history of drug and alcohol abuse, his treatment efforts, and the effect of his abuse on his work performance. (Doc. No. 30 at 6-8).

Swint also establishes the second prong. The record supports an inference that Landis was aware Swint recently had completed counseling recommended by the EAP. Further, the record also supports an inference that Courtemanche sent the information to Landis at Mosley's direction. (*See* Doc. No. 39-19). Combined, these inferences satisfy Swint's low burden of identifying a genuine

---

[2] Ohio courts interpreting § 4112.02 rely on cases interpreting the Americans with Disabilities Act as well. *Carnahan v. Morton Bldgs. Inc.*, 41 N.E.3d 239, 243 (Ohio Ct. App. 2015) (citing *Columbus Civ. Serv. Comm. v. McGlone,* 697 N.E.2d 204 (Ohio 1998)).

6

dispute of material fact as to whether DuPont acted at least in part because of Swint's disability. *Mattessich v. Weathersfield Twp.*, 59 N.E.3d 629, 635 (Ohio Ct. App. 2016). DuPont's attempt to invoke the business-judgment rule, (Doc. No. 30 at 17-18), is not persuasive, as an employer's explanation for its behavior is relevant only at the pretext stage. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Finally, Swint also establishes the third prong of his prima facie case. DuPont states Swint "was fully capable of performing the essential functions of his job" at the time of the tank wagon incident. (Doc. No. 42 at 7).

### B. PRETEXT

DuPont asserts it had a legitimate, non-discriminatory reason for terminating Swint – his statement on an official DuPont record that there was a gasket in the tank wagon manhole cover despite his knowledge that the gasket in fact was missing. Misstating "official company records" is considered an ethical violation under DuPont's code of conduct. (Doc. No. 36-5 at 6). Swint's assertion that this reason was created only after this litigation began, (Doc. No. 38 at 19), is unpersuasive. The contours of this explanation are well-established by contemporary documentary evidence. (*See, e.g.,* Doc. No. 40-16; Doc. No. 39-23).

Swint argues his checklist error did not actually motivate DuPont's actions and that he was forced to resign in lieu of termination because of Landis' long-standing bias against him, dating back to Swint's first attempt to seek treatment for his addiction. (Doc. No. 38 at 7, 22). Swint fails to identify sufficient evidence to support this argument.

First, Swint's recollection of Landis' actions in the mid-1980s mixes up the timeline. He argues "Landis issued an overall Job Performance Probation to Swint threatening discharge for future substance abuse issues" upon Swint's return to work from an inpatient treatment program. (Doc. No. 38 at 7). The record evidence, however, does not support this contention. Instead, it

shows Swint "was placed on Overall Job Performance Probation on November 25, 1985." (Doc. No. 37-3 at 1). This was over one month prior to Swint's admission to an alcoholism and chemical dependency treatment center in January 1986. (Doc. No. 34 at 8).

Further, less than a year after Swint's discharge from the treatment program, Landis memorialized Swint's removal from his performance probation, noting he was removed "because of his efforts put forth to improve and maintain the quality of his job performance." (Doc. No. 37-3 at 1). Landis indicated Swint would be subject to further corrective action if his job performance declined again and that "[i]f in the future [Swint] admits to substance abuse or that abuse needed further correction, [DuPont] would look at a 90-day leave of absence without pay or discharge pending an investigation of the facts." (*Id.*).

Second, Swint's claim that Landis "demanded Swint be terminated immediately [following an April 2006 positive drug screen] because of his addiction issues" is supported only by hearsay. (Doc. No. 38 at 8 (emphasis removed). During his deposition, Swint stated "Steve Black[, Swint's supervisor at the time,] told me that Scott Landis told him, told Steve Black, to set me up and fire me for my addiction." (Doc. No. 34 at 38). Landis denies telling Black to fire Swint, (Doc. No. 31-1 at 13), and Black was not deposed in this litigation. Swint points to Black's purported out-of-court comments to prove the truth of the matter asserted – that Landis intended to treat Swint differently because of Swint's disability – and therefore this statement is inadmissible hearsay. *See Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996).

Moreover, as DuPont notes, Landis chose to issue Swint a written reprimand in 2010 after Swint failed to close a valve on a solvent tank rather than to pursue Swint's termination at that time. This intervening disciplinary event further defeats any inference of discriminatory animus Swint seeks to draw from Landis' knowledge of Swint's addiction.

8

Further, Swint's attempt to show DuPont's reason for terminating him was insufficient to motivate DuPont's actions by pointing to other employees who were not terminated after allegedly making similar errors falls short. A plaintiff seeking to prove he was treated more harshly than similarly situated employees must identify how those employees were similar to the plaintiff – that they "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007) (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 599 (6th Cir. 2001)).

Swint offers only his conclusion that nine other employees at the Toledo facility committed the same or more serious errors. (*See* Doc. No. 38 at 11). He does not point to any evidence that any of these employees were accused of misstating a company record. Nor does Swint offer any evidence these individuals (whose incidents dated from the 1970s to the 2000s) were subject to the same standards or dealt with the same supervisor.

Further, while he claims 17 other DuPont employees were not terminated after being accused of falsifying a document, he points to no evidence to support his assertion that these employees were in fact similarly situated. (Doc. No. 38 at 25). The similarly-situated requirement begins with a determination that the proposed comparable employee is not a member of the same protected class as the plaintiff. *See, e.g., McMillan v. Castro*, 405 F.3d 405, 412-13 (6th Cir. 2005); *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480 (6th Cir. 2008). Swint offers no evidence as to whether or not any of these individuals fall within the same protected class.

Even if I were to assume none of these individuals also have a disability, Swint cannot establish a genuine dispute of material fact without facts to support the inference that none of these incidents involved circumstances which differentiate or mitigate the employee's conduct or DuPont's treatment of the incident. *See Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 415

9

(6th Cir. 2017). He also fails to grapple with the 27 employees who were terminated for the same Code of Conduct violation or to acknowledge that in 4 of the 17 cases he seeks to rely on, the employee in question elected to resign or retire prior to the completion of the disciplinary process. (Doc. No. 39-17 at 2).

Swint fails to rebut DuPont's legitimate, nondiscriminatory reason for ending his employment and therefore he cannot show DuPont acted "because of" his addiction to drugs and alcohol in violation of Ohio law.

## V.    Conclusion

For the reasons stated above, I grant DuPont's motion for summary judgment. (Doc. No. 30).

So Ordered.

                                              s/ Jeffrey J. Helmick
                                              United States District Judge